IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**JONATHAN SANTIAGO HERNANDEZ**<br>Defendant. | Crim. No. 21-450 (PAD) |

**REPORT AND RECOMMENDATION**

On May 11, 2022, Defendant Jonathan Santiago-Hernández was charged in a First Superseding Indictment with two counts of violations of 21 U.S.C. §§ 841 and 846, and one count of violation of 18 U.S.C. § 924(c)(1)(A). Docket No. 37. Defendant filed a motion to suppress all statements given by him to law enforcement on December 17, 2021. Docket No. 169. The United States opposed at Docket No. 178. The matter was referred to me for a hearing and Report and Recommendation. Docket No. 181. An evidentiary hearing was held on September 12, 2024 and October 1, 2024. The Government called Task Force Officer of the U.S. Drug Enforcement Administration (DEA) Juan Ruiz-Vázquez and DEA Special Agent Jorge Ochoa. The Defendant testified on his own behalf. Documentary evidence was admitted. Post-hearing briefs were received. Docket Nos. 235-236. After carefully considering the evidence and arguments, the undersigned recommends that Defendant's motion to suppress be **DENIED**.

   I.   **Factual Background**

The following account is drawn from the credible evidence received at the evidentiary hearing, and the submission made by Defendant with his motion to suppress.

Prior to December 17, 2021, the DEA had information that Defendant was involved in a drug trafficking organization. Transcript of Suppression Hearing on September 12, 2024 ("Tr. 09.24") at 30 ¶¶ 18-21. On December 17, 2021, the DEA decided to surveil and approach Defendant. Tr. 09.24 at 31 ¶¶ 11-13. Surveillance started in the morning hours and involved five to nine agents. Tr. 09.24 at 31 ¶¶ 11-22; Transcript of Suppression Hearing on October 1, 2024 ("Tr. 10.24") at 16 ¶ 1. DEA agents were driving at least five different vehicles, which were unmarked. Tr. 09.24 at 32 ¶¶ 1-2, 70 ¶¶ 19-21, 71 ¶¶ 8-13; Tr. 10.24 at 16 ¶¶ 3-5. Surveillance started in Guaynabo, at the house of the Defendant, and proceeded to Santurce, where he dropped

**United States v. Santiago-Hernández**
**Criminal No. 21-450 (PAD)**
**Report and Recommendation**

off his son at school. Tr. 09.24 at 32 ¶¶ 15-18, 33 ¶¶ 9-24; Tr. 10.24 at 15 ¶¶ 3-24. In Condado Street, agent Ruiz-Vázquez placed his unmarked vehicle next to Defendant's car, asked Defendant to roll down his window, identified himself with a DEA identification, and asked whether Defendant would talk to him. Tr. 09.24 at 34 ¶¶ 6-12, 37 ¶¶ 1-20, 38 ¶¶ 22-25; Defendant's Declaration Under Penalty of Perjury at Docket No. 172-1 ¶¶ 5-6 ("The car pulled up alongside my car. A man exited the car with a Drug Enforcement Administration ("DEA") badge who later I found out was Task Force Officer Juan Ruiz Vazquez ("Ruiz"). Ruiz called me by my name and ordered me to roll down my window because he said that he needed to ask me questions."). Defendant agreed and parked his vehicle. Tr. 09.24 at 39 ¶¶ 2-12. Ruiz-Vázquez parked his vehicle behind Defendant's car. Id. Ruiz-Vázquez gave Defendant verbal Miranda warnings. Tr. 09.24 at 41 ¶¶ 10-15. Ochoa arrived on foot. Tr. 09.24 at 39 ¶¶ 14-18; Tr. 10.24 at 16 ¶¶ 9-12, 17 ¶¶ 20-24. Ruiz-Vázquez and Ochoa were wearing civilian clothes and were armed but their guns were not visible. Tr. 09.24 at 39 ¶¶ 20-24, 75 ¶ 7; Tr. 10.24 at 19 ¶¶ 23-24, 20 ¶¶ 2-7. Ruiz-Vázquez and Ochoa informed Defendant that he was part of an investigation, that they wanted to speak to him but that he was not under arrest, and that the conversation would be free and voluntary. Tr. 09.24 at 41 ¶¶ 3-15; Tr. 10.24 at 18 ¶¶ 14-25, 20 ¶¶ 19-22, 98 ¶¶ 21-25, 99 ¶¶ 1-17; Docket No. 172-1 ¶ 7 ("Ruiz said that I was not under arrest […]."). Ruiz-Vázquez, Ochoa, and Defendant were calm. Tr. 09.24 at 42 ¶¶ 19-24. Defendant expressed concern about speaking in the streets of Santurce and Ruiz-Vázquez offered to speak at the DEA office in Metro Office Park. Tr. 09.24 at 43 ¶¶ 3-8; Tr. 10.24 at 18 ¶¶ 21-25. At the time, Ruiz-Vázquez and Ochoa did not ask Defendant whether he had a firearm with him. Tr. 09.24 at 45 ¶¶ 15-17, 55 ¶¶ 22-24; Tr. 10.24 at 94 ¶¶ 17-18, 111 ¶¶ 23-24. Defendant agreed to go to the offices of the DEA. Tr. 10.24 at 19 ¶¶ 15-22. He asked whether he had to go in the car of the agents and he was told that he could go in his own car. Tr. 09.24 at 43 ¶¶ 10-13; Docket No. 172-1 ¶ 9 ("I followed the DEA SUV back to the agents' office while the DEA car followed my car."). Defendant was not told that he could not use his cellular phone. Tr. 09.24 at 80 ¶¶ 24-25, 81 ¶ 1. Defendant was not frisked, searched, placed or transported in a patrol unit, or handcuffed that day, which are the measures usually followed by DEA during an arrest. Tr. 09.24 at 57-61; Tr. 10.24 at 94 ¶¶ 9-24.

Defendant followed Ruiz-Vázquez's car to the DEA office in Metro Office Park. The ride took 10 to 15 minutes. Tr. 09.24 at 43 ¶¶ 15-25, 81 ¶¶ 11-25; Docket No. 172-1 ¶ 9. Defendant

parked his vehicle in the facilities of the DEA, after having been granted access by the DEA agents to the gated parking area. Tr. 09.24 at 44 ¶¶ 1-4, 82 ¶¶ 10-24. Defendant was escorted by approximately four agents to a witness room inside the DEA for interview. Tr. 09.24 at 88 ¶¶ 7-12; Docket No. 172-1 ¶ 11. Defendant arrived at the DEA facility with a bag that contained a firearm. Tr. 09.24 at 45 ¶¶ 9-14; Docket No. 172-1 ¶ 10. The firearm remained in the bag during Defendant's interview, but Defendant could not access the bag or the firearm during the interview. Tr. 09.24 at 46 ¶¶ 1-3, 85 ¶¶ 12-14; Tr. 10.24 at 28 ¶¶ 12-24, 49 ¶¶ 11-20; Docket No. 172-1 ¶ 12. Present in the interview room were at least four agents, including Ruiz-Vázquez and Ochoa. Tr. 09.24 at 44 ¶¶ 14-24; Tr. 10.24 at 22 ¶¶ 17-18, 43 ¶¶ 14-16, 52 ¶¶ 8-10. Ruiz-Vázquez, Ochoa and DEA Task Force Officer Roberto Arenas conducted the interview. Tr. 09.24 at 47 ¶¶ 3-5; Tr. 10.24 at 56 ¶¶ 3-17. The interview room was small. Tr. 09.24 at 107 ¶¶ 22-24; Tr. 10.24 at 21 ¶¶ 4-9. Miranda warnings were not imparted at that time. Tr. 09.24 at 93 ¶¶ 16-19; Tr. 10.24 at 36 ¶¶ 20-23; Docket No. 172-1 ¶ 15. Defendant was again told that he was not under arrest, that the interview was voluntary, and that he could leave or stop the interview at any time. Tr. 10.24 at 21 ¶¶ 11-16. He was offered and brought breakfast. Tr. 10.24 at 21 ¶¶ 17-23. Defendant had his cellular phone in front of him during the interview and he was allowed to answer a call from his son during the interview. Tr. 10.24 at 82 ¶¶ 9-11, 88 ¶¶ 13-19. Defendant was asked questions about an open investigation involving him. Tr. 09.24 at 94 ¶¶ 16-23; Docket No. 172-1 ¶ 16. The tone of the agents during the interview of Defendant was passive and calm. Tr. 09.24 at 63 ¶¶ 21-23; Tr. 10.24 at 36 ¶¶ 13-16. Defendant did not ask for the presence of an attorney. Tr. 09.24 at 49 ¶¶ 2-5. Defendant was calm or relaxed; he did not seem nervous and did not refuse to answer questions during the interview. Tr. 09.24 at 53 ¶ 25, 63 ¶¶ 17-20; Tr. 10.24 at 29 ¶¶ 2-21, 35 ¶¶ 13-17. Defendant was asked whether he would be interested in cooperating with the DEA and was given a contract in Spanish, which he initialed and signed. Tr. 10.24 at 31 ¶¶ 22-25, 45 ¶¶ 6-19, 57 ¶¶ 19-25. Defendant agreed to cooperate with the DEA. Tr. 09.24 at 53 ¶¶ 13-15, 61 ¶¶ 10-21. The interview lasted less than two hours. Tr. 10.24 at 83 ¶¶ 11-12. Upon conclusion of the interview, Ochoa took Defendant's fingerprints and assumed that Defendant's photograph was also taken as part of the normal procedure applicable to cooperators. Tr. 10.24 at 32 ¶¶ 1-20; Docket No. 172-1 ¶ 18 ("DEA agents then took me out of the interrogation room to take my fingerprints and photograph me and my tattoos."). Before leaving the DEA facility, Defendant was

handed his bag with the firearm. He left the DEA facility in his car. Tr. 09.24 at 56 ¶¶ 10-14, 105 ¶¶ 3-8; Tr. 10.24 at 33 ¶¶ 14-22; Docket No. 172-1 ¶¶ 19-20. He was granted access to leave the DEA parking area by an agent. Tr. 09.24 at 103 ¶¶ 1-8; Tr. 10.24 at 33 ¶¶ 14-22. The following Monday, Defendant went to the offices of the DEA with an attorney and informed that he no longer wanted to cooperate with the DEA. Tr. 10.24 at 34 ¶¶ 3-19; Docket No. 172-1 ¶ 21 ("The following Monday, I returned to the DEA facility with my defense attorney but I was not arrested at that time.").

## II.    Discussion

### A.    Defendant's testimony was not convincing.

As a threshold matter, I address Defendant's credibility. Defendant testified during the hearing. However, his account of the chain of events differs in significant respects from the accounts of Ruiz-Vázquez and Ochoa, and crucially from the declaration under penalty of perjury submitted by him in support of his motion to suppress at Docket No. 172-1.

For example, Defendant initially testified that, on the day of the events in Santurce, Ruiz-Vázquez pulled his car to the side of his, asked Defendant to roll down the window and park his car, presented his DEA identification, and told him he wanted to speak. Tr. 10.24 at 75 ¶¶ 2-20. Later in his testimony, Defendant added that he did not pull over voluntarily, but that Ruiz-Vázquez blocked his pathway with the car and asked him to park. Tr. 10.24 at 90 ¶¶ 18-23, 91 ¶¶ 1-4, 92 ¶¶ 2-6. According to this portion of Defendant's testimony, Defendant was not free to leave once Ruiz-Vázquez blocked his car in Santurce. But this last version of the events prior to talking to Ruiz-Vázquez is nowhere in his written declaration at Docket No. 172-1. In paragraph 5 of the written declaration, Defendant stated that the car driven by Ruiz-Vázquez pulled alongside his and that the agent identified himself as from the DEA. Docket No. 172-1 ¶ 5. Defendant's written account is consistent with the testimony of Ruiz-Vázquez: that Ruiz-Vázquez placed his unmarked vehicle next to Defendant's car, asked Defendant to roll down his window, identified himself with a DEA identification, and asked the Defendant to talk. Tr. 09.24 at 34 ¶¶ 6-12, 37 ¶¶ 1-20, 38 ¶¶ 22-25.

Defendant also testified that a third man with a gun in hand approached him in the street in Santurce. Tr. 10.24 at 76 ¶¶ 8-9. And that there were four agents at that time, which were "on top of him" so he could not leave. Tr. 10.24 at 92 ¶¶ 17-25, 93 ¶¶ 1-12. But these very crucial and

significant details are again missing in Defendant's written declaration at Docket No. 172-1. See Docket No. 172-1 ¶¶ 6-8. And Ruiz-Vázquez's and Ochoa's testimonies were consistent— they were the only two agents that spoke to Defendant in the street of Santurce and, even though they both had their weapons, these were not drawn or visible to Defendant. Tr. 09.24 at 39 ¶¶ 2-24, 39 ¶¶ 14-18, 75 ¶ 7; Tr. 10.24 at 16 ¶¶ 9-12, 17 ¶¶ 20-24, 19 ¶¶ 23-24, 20 ¶¶ 2-7.

Defendant also testified that, during the interview in the DEA facility, he was asked to cooperate and refused, and that he was given a blank piece of paper to sign, which he signed so he could leave. Tr. 10.24 at 85 ¶¶ 12-25, 101 ¶¶ 13-22. But this is inconsistent with his written declaration, where he stated that he was given a paper in English to sign. Docket No. 172-1 ¶ 21. It is also inconsistent with the testimony of agents Ruiz-Vázquez and Ochoa that Defendant agreed to cooperate with the DEA and was shown a cooperator's agreement in Spanish, which he signed. Tr. 09.24 at 53 ¶¶ 13-15, 61 ¶¶ 10-21; Tr. 10.24 at 31 ¶¶ 22-25, 45 ¶¶ 6-19, 57 ¶¶ 19-25. More importantly, Defendant's testimony that he did not agree to cooperate with the agency is opaqued by both his written statement indicating that he returned to the DEA the following Monday and by the testimony of Ruiz-Vázquez and Ochoa that Defendant returned to the DEA to inform that he was no longer interested in cooperating. Tr. 10.24 at 34 ¶¶ 3-19; Docket No. 172-1 ¶ 21.

The inconsistencies between Defendant's written statement and verbal testimony, and the contradictions with the testimonies of Ruiz-Vázquez and Ochoa are all significant and material to the Court's analysis and recommendation. The Court is tasked with making a credibility assessment of Ruiz-Vázquez, Ochoa, and the Defendant. After watching the demeanor of Ruiz-Vázquez and Ochoa during their testimonies, the undersigned deems them to have been credible. In turn, Defendant's credibility is lacking. That Defendant's written declaration did not include crucial details of the issues before the Court, and that those details were only brought forth by Defendant during the hearing, fatally undermines his testimony generally. See United States v. Melo, 954 F.3d 334, 341 (1st Cir. 2020) (assertions not included in the initial affidavit and raised for the first time at hearing led the court to supportably conclude that defendant's testimony at the hearing was not convincing).

### B.     Defendant was not subject to a custodial interrogation.

Pursuant to the Fifth Amendment of the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Premised

on this constitutional right, the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 444 (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." United States v. Lugo Guerrero, 2005 WL 8163207, at *6 (D.P.R. Oct. 14, 2005). The procedural safeguards under Miranda require that the suspect be adequately and effectively appraised of his rights, and that the exercise of those rights be honored by law enforcement. Missouri v. Seibert, 542 U.S. 600, 608 (2004). To be sure, Miranda not only requires that the suspect be informed of his rights but that police cease questioning immediately upon the assertion of rights. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Therefore, the Fifth Amendment privilege against self-incrimination requires that, prior to questioning a suspect, the police appraise the suspect of his right to remain silent and to have counsel present during questioning, that counsel could be appointed free of charge, and of the state's intention to use any of his statements to secure a conviction. Moran v. Burbine, 475 U.S. 412, 420 (1986) (discussing Miranda, 384 U.S. at 468-470, 473-474).

      Law enforcement's obligation to give a suspect Miranda warnings is triggered only prior to conducting a custodial interrogation. United States v. O'Neal, 17 F.4th 236, 240 (1st Cir, 2021). This has two components—custody and interrogation. United States v. Molina, 781 F.3d 13, 21 (1st Cir. 2015) (citations omitted); United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). If one of these is missing, the right to Miranda warnings does not attach. Naturally, if a person is arrested, he is in custody. But a person can also be deemed to be in custody when his freedom of movement is restrained to the degree associated with a formal arrest. United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012) (citations and quotations omitted). Interrogation has been defined to include express questioning by law enforcement or its functional equivalent. Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980); Ventura, 85 F.3d at 711. If agents use words or incur in actions that they should know are reasonably likely to elicit an incriminating response from a suspect, they will be deemed to have interrogated the suspect. United States v. Sánchez, 817 F.3d 38, 44 (1st Cir. 2016) (quoting Innis, 446 U.S. at 301).

      There is no question that Defendant was interrogated by the DEA on December 17, 2021. The DEA had already identified Defendant as a suspect of drug trafficking. Tr. 09.12 at 30 ¶¶ 10-25, 31 ¶¶ 1-13. They surveilled him that morning, followed him to Santurce, and asked to speak to

him. Id. As evidenced by the testimonies of Ruiz-Vázquez and Ochoa, and the Report of Investigation at Docket No. 169-2, the questions posed to Defendant covered the nature of his employment, his earnings, search warrants executed on residences which resulted in the seizure of cocaine, and his relationship with persons that may have been involved in drug trafficking. Tr. 09.24 at 46-53; Tr. 10.24 at 23-29. It follows that the DEA agents should have known that their questions to Defendant would likely elicit incriminating responses from him.

I turn my attention to the custody portion of the inquiry. See O'Neal, 17 F.4th at 240; Melo, 954 F.3d at 339. The First Circuit uses a two-step process to determine whether a person was in custody, triggering Miranda obligations by law enforcement. United States v. Cruz-Rivera, 14 F.4th 32, 48 (1st Cir. 2021); Melo, 954 F.3d at 339. The first question is whether a reasonable person in the place of the defendant would not feel free to end the encounter and leave. Cruz-Rivera, 14 F.4th at 48; Melo, 954 F.3d at 339. To answer this question, the First Circuit considers a non-exhaustive list of factors, neither of which are dispositive. Among those factors are the location where the interrogation took place, the number of law enforcement officers present at the encounter, the degree of physical restraint placed on the defendant, and the duration and character of the interrogation. Cruz-Rivera, 14 F.4th at 48. Other relevant factors can include evidence of hostility by agents (id. at 50) and statements made during the interview and the release of the interviewee at the end of the questioning. Howes v. Florida, 565 U.S. 499, 509 (2012). The focus is on the objective circumstances of the interrogation and not on any subjective views of the agents or the suspect. Melo, 954 F.3d at 341. The second part of the inquiry requires that the Court consider whether the environment of interrogation presented inherently coercive pressures, as those present in Miranda. Howes v. Florida, 565 U.S. at 509; Cruz-Rivera, 14 F.4th at 50; Melo, 954 F.3d at 341. A custody determination is made only after considering the totality of circumstances. Infante, 701 F.3d at 396.

I look at the initial contact with Defendant in Santurce first. The evidence before the Court established that Defendant was the subject of a DEA investigation regarding his participation in drug trafficking activities. It also established that Defendant was followed from Guaynabo to Santurce by DEA agents as part of an organized plan of surveillance. But the mere fact that he was a suspect subject to surveillance does not make the encounter with the DEA in Santurce custodial. See Melo, 954 F.3d at 342 (suspect having been told that he was the target of investigation did not

turn encounter into a custodial one). The credible evidence established that Ruiz-Vázquez drove his car alongside that of Defendant, asked Defendant to roll down his window, identified himself as a DEA agent, and told Defendant he wanted to talk to him. Defendant then parked his car to the side of the road and Ruiz-Vázquez parked behind him. When Ruiz-Vázquez approached Defendant, he was wearing plain clothes, and his gun was not visible. He was joined by Ochoa, who was also on civilian clothes and had a weapon that was not visible to Defendant. They spoke to Defendant and made no physical contact. Defendant was not frisked, searched, or handcuffed. In fact, Defendant was not even asked whether he had a firearm at that time. These factors weigh heavily in favor of a finding that the encounter with Defendant in Santurce was non-custodial. See e.g., O'Neal, 17 F.4th at 241 (concealed weapons not drawn); Melo, 954 F.3d at 340 (armed but no brandishing); United States v. Swan, 842 F.3d 28, 33 (1st Cir. 2016) (weapons not drawn, no handcuffs, no restraints); United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) (no brandishing of weapon, weapons in holster, no physical contact); United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (plain clothes, no visible weapons).

      What happened next also cuts against a finding of custody. According to the testimony, Ruiz-Vázquez and Ochoa asked Defendant whether he was willing to speak to them. Defendant was informed that he was not under arrest and that his decision to speak would be free and voluntary. See e.g., Swan, 842 F.3d at 32 (informing that no arrest and that defendant is free not to speak and to leave at any point are unambiguous statements that would lead a reasonable person to understand that he was not in custody); Guerrier, 669 F.3d at 6 (defendant told that he was not under arrest, that he did not have to answer, and that he could come and go as pleased); Infante, 701 F.3d at 396-98 (defendant told encounter was voluntary, that he did not have to talk, and was not under arrest). Ruiz-Vázquez and Ochoa described their demeanor in Santurce, and that of Defendant, as calm. Defendant merely expressed a concern about speaking in the middle of the street in Santurce because people there knew him. He was then offered to speak at the offices of the DEA and he agreed. Defendant followed Ruiz-Vázquez's car to the DEA. He drove his own car. In his car, Defendant had his firearm and cellphone. At no point was he told that he could not use his cellphone. This chain of events comfortably supports a conclusion that the encounter with Defendant at Santurce was voluntary and non-custodial. See e.g., Swan, 842 F.3d at 31 (there was a suggestion that defendant speak to police at the sheriff's office, but she was not ordered to ride

with law enforcement and she drove her own car to the station, strongly suggesting that defendant was not in custody).

I turn to the DEA facility. Defendant argues that the environment there rapidly became coercive. Defendant points to the following factors: (1) he could not enter or leave the DEA facility (both the parking area and the offices) on his own or without being granted access by DEA agents, (2) at least six DEA agents were involved in the encounter in the DEA facility, (3) the interview took place in a small windowless room, (4) Defendant was not allowed to have access to his bag during the interview, which contained his firearm and identifications, (5) Defendant was not allowed to answer phone calls, except one call from his son, (6) Defendant was accompanied to the bathroom, and (7) the interrogation lasted almost two hours. I address each one.

There is no question that Defendant could not enter or leave the DEA facility without the assistance of DEA agents. And that this is not a neutral setting for Defendant. But the need to have DEA agents control access to the DEA facility is a natural consequence of the work that is conducted there and to address reasonable security concerns. The barriers for Defendant to access or leave the parking facility or the offices of the DEA were not put in place for Defendant. Even though the DEA facility may not have been a comfortable setting for Defendant, any reasonable person who agrees to an interview at the DEA facility would expect to find his access to the facility restricted. Tr. 10.24 at 43 ¶¶ 1-10 (DEA is a restricted facility not accessible to the public. Only individuals with authorization and security clearance can enter). See Swan, 842 F.3d at 32 (mere fact that questioning took place in police station did not make the interrogation custodial).

Defendant argues, and testified at the hearing, that at least six agents participated in the encounter at the DEA and were present in the interview room. Tr. 10.24 at 79 ¶¶ 1-4, 81 ¶¶ 3-5. He also testified that four agents asked questions during the interview. Tr. 10.24 at 83 ¶¶ 13-19. Defendant's testimony with respect to the number of agents involved in the encounter is contradicted by the testimony of Ruiz-Vázquez and Ochoa, which established that at any given time there were a maximum of four agents in the interview room and that the interview was conducted by no more than three agents.[1] Indeed, the agents' testimony is consistent with the Report of Investigation at Docket No. 169-2, which was drafted by Ochoa and lists only three other

---

[1] Ruiz Vázquez testified that he and Ochoa asked the questions. While Ochoa testified that TFO Arenas also asked questions. Tr. 10.24 at 56 ¶¶ 3-17.

9

agents in the interview at the DEA. That four agents may have been present in the interview room, and three of those may have participated in asking the questions, is not in and of itself evidence of a coercive or custodial environment. See O'Neal, 17 F.4th at 241 (no custody found when three in room and two outside); Infante, 701 F.3d at 397 (no custody found when two inside briefly joined by two others); Hughes, 640 F.3d at 436 (four officers involved, two conducted interview and 2 remained apart; no custody).

  Next, the evidence established that, despite knowing that Defendant had a license to bear firearms (Tr. 09.24 at 83 ¶¶ 17-20), Ruiz-Vázquez and Ochoa did not ask Defendant in Santurce whether he had his firearm. It was not until Defendant arrived at the DEA facility that he was asked about the firearm. There is a dispute as to whether this happened immediately upon arrival at the DEA or later, but given the fact that Defendant was allowed to bring his bag with the firearm inside the building and all the way to the interview room, I am inclined to believe that the question was not raised until arrival at the interview room. See also Report of Investigation at Docket No. 169-2 at 4 ("Santiago-Hernandez' pistol was kept inside a black bag Santiago-Hernandez carried with him into the interview."). Be that as it may, Defendant argues that, because he was not allowed to have access to his bag with the firearm, his belongings were seized and the interview was custodial. This is too large of a logical leap. First, that Defendant would have been asked to temporarily surrender access to his bag with the firearm is a reasonable safety measure taken by the DEA. After all, they were questioning a person known to have been involved in drug trafficking. To expect DEA agents to allow suspects unrestricted access to firearms during interviews would defy logic and safety concerns. Second, there is absolutely no evidence that Defendant's bag was seized. The bag was inside the same room with Defendant and there is no evidence that anyone reached for, or handled, the bag during the interview. To equate keeping Defendant from temporarily having access to his bag to a seizure of property is farfetched.

  Defendant makes much out of not being able to answer phone calls during the interview. But he fails to acknowledge that he was allowed to keep his phone during the car ride to the DEA, he was allowed to keep his phone in front of him during the interview, and he was also allowed to answer a phone call from his son during the interview. Swan, 842 F.3d at 33 (police initially took defendant's phone and afterwards allowed defendant to take a call; not custodial). That he may not have been given privacy for the call as was the case in Swan does not offset the fact that, contrary

10

to a typical custodial situation, Defendant was allowed to have access to his cellphone throughout the interview and was also allowed to answer a call.

Defendant testified that during the interview he asked to go to the bathroom and was accompanied by Ochoa. Tr. 10.24 at 84 ¶¶ 13-25, 85 ¶¶ 1-8. According to his testimony, the bathroom was inside a cell and Ochoa remained behind the partly opened door while he used the bathroom. Id. Again, it is reasonable to expect that, once inside the DEA facility, a person without security clearance would not be allowed to roam freely without supervision. Having been escorted to the bathroom while remaining at the door is not a significant restraint under the circumstances. See e.g., Hughes, 640 F.3d at 436 (accompany to smoke without evidence of intrusion on intimate moment or private activity, no restraint associated with arrest); Melo, 954 F.3d at 343 (agent did not go into the bathroom, no restriction to warrant custody determination). Defendant also testified, and the testimony of Ruiz-Vázquez seems to confirm, that the interview at the DEA lasted between one hour and forty minutes to two hours. Tr. 09.24 at 53 ¶¶ 16-22; Tr. 10.24 at 83 ¶¶ 11-12, 112 ¶¶ 16-21, 113 ¶ 2. This is not a short interview, but it is not extraordinarily long either. See O'Neal, 17 F.4th at 241 (two and half hours non-custodial under the circumstances); Swan, 842 F.3d at 33 (90 minutes not custodial); Ventura, 132 F.3d at 848 (one hour and twenty minutes not extraordinary).

Another argument raised by Defendant is that Ochoa testified to have been armed during the interview. Tr. 10.24 at 48 ¶¶ 16-23. Ochoa's firearm was under his shirt and not visible to Defendant. Per the case law cited above, having non-visible or upholstered firearms is not inherently coercive. Defendant also raises the issue that the agents did not allow him to consult with counsel. The basis of this argument is that Defendant mentioned during the interview that he had consulted with counsel after learning of a seizure of cocaine. But the credible testimonial evidence received during the hearing established that Defendant did not ask to speak to counsel (Tr. 09.24 at 49 ¶¶ 2-5) nor refused to answer questions or condition his answers to questions on the presence of counsel. Tr. 09.24 at 53 ¶ 25, 63 ¶¶ 17-20; Tr. 10.24 at 29 ¶¶ 2-21, 35 ¶¶ 13-17.

Defendant points to the substance of the interrogation—questions regarding Defendant's drug trafficking activities—as additional evidence of custody. This argument ignores two fundamental premises. First, that according to the evidence, Defendant was advised prior to his decision to proceed with the interview at the DEA facility that he was part of an investigation so

he already knew ahead of the interview the matters that would be discussed. Second, that the agents explicitly told Defendant that the interview was free and voluntary and that he could stop the interview at any time.[2] Furthermore, as discussed above, the inquiry here is not whether the agents intended to seek incriminating statements during the interview or whether Defendant became intimidated by the substance of the questions posed by the agents. Melo, 954 F.3d at 341. The relevant inquiry is an objective one: would a person in Defendant's position feel that he was not free to end the encounter and leave and whether the environment of interrogation presented inherently coercive pressures. Considering that Defendant knew ahead of time that he was the target of an investigation, the substance of the interrogation cannot be objectively viewed as restrictive or coercive. This conclusion is bolstered by the following evidence received during the hearing: the agents' tone and demeanor during their encounter with Defendant in Santurce and at the DEA facility was calm, Defendant was calm and relax and willingly agreed to talk to agents and drive to the DEA, Defendant was given breakfast,[3] he willingly answered the questions posed by the agents at the DEA,[4] and expressed a willingness to cooperate with the DEA.

Finally, Defendant seeks for the Court to infer custody from the signing of a cooperator's agreement, and the taking of Defendant's fingerprints and photographs. The evidence established that all this occurred after the incriminating statements by Defendant and as part of the regular process followed by the DEA to enlist cooperators. Setting DEA procedures aside, the law is clear that the Court's analysis of custody is done looking at the time when the relevant statements are made. Actions of law enforcement after the time when the statements are made are inconsequential to the analysis. See Cruz-Rivera, 14 F.4th at 49 (physical restraints placed after the statements inconsequential); Swan, 842 F.3d at 31-32 (the focus is on the time that the relevant statements were made not before or after); Hughes, 640 F.3d at 436-37 (defendant taken into protective custody after the statements of no consequence).

---

[2] Defendant testified that he was not told that he was free to leave. Tr. 10.24 at 81 ¶¶ 21-22. This was contradicted by the testimony of Ruiz-Vázquez and Ochoa.

[3] See Howes v. Florida, 565 U.S. at 515 (the offer of food and water is an objective factor that can be considered with other factors to conclude that the suspect was free to end the interview and leave).

[4] Tr. 10.24 at 29: Defendant "just shared details with us willingly" and "[H]e was willing to answer questions and provide details [ ].".

**United States v. Santiago-Hernández**
**Criminal No. 21-450 (PAD)**
**Report and Recommendation**

In sum, I have examined the totality of the circumstances and find as follows. There is no dispute that the interrogation of Defendant occurred in a small windowless room and that Defendant would have had to ask DEA agents to escort him out of the DEA facility had he wanted to stop the interview and leave the DEA. But those factors were offset by the rest of the circumstances surrounding the interview of Defendant. DEA approached the Defendant and asked him whether he was willing to be interviewed. He was not arrested, frisked, searched, or physically restrained in any way. He then agreed to drive himself to the DEA. He was given breakfast, advised that the interview was free and voluntary, and that he could leave at any time. He was allowed to keep his cellphone and was even allowed to enter the interview room with a firearm in his bag. Defendant was not in handcuffs or otherwise restrained. He agreed to answer questions, the interview was conducted in a calm tone, and he appeared relax and calm. Defendant then agreed to cooperate with the DEA. There is simply no objective basis on which to find that a reasonable person in Defendant's place would not have felt free to decline the interview or end the interview and leave the DEA. There is also no indication that Defendant was subjected to an objectively restrictive or coercive environment. For these reasons, I find that Defendant's interview on December 17, 2021 was not custodial and that Miranda rights were not implicated. Defendant's motion to suppress should be **DENIED.**

**IT IS SO RECOMMENDED.**

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed within fourteen (14) days of its receipt. Failure to file timely and specific objections to the Report and Recommendation is a waiver of the right to review by the District Judge and of appellate review. Thomas v. Arn, 474 U.S. 140, 154-155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992).

In San Juan, Puerto Rico, this 25th day of February, 2025.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge